**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

ALBERT WILLIAM RENNER,     )
                        )
           Plaintiff,    )
                        )      Case. No. 1:08-cv-209-SJM
       v.               )
                        )
ROUNDO AB, a foreign corporation,  )
*et al.,*                       )
                        )
          Defendant.   )

## MEMORANDUM OPINION

McLAUGHLIN, SEAN J., District J.,

       Plaintiff, Albert William Renner, an employee of GE Transportation Company ("GE") in Erie, Pennsylvania, filed this products liability lawsuit as a result of injuries he sustained while operating of a Roundo Angle Bending Roll Double Pinch Type R2 Machine (the "Roll Machine") designed and manufactured by Defendant Roundo AB ("Roundo"), a Swedish corporation, and sold to GE by Comeq, Inc. ("Comeq"), a Maryland corporation.  After being commenced in state court, the case was removed here.  We have subject matter jurisdiction over the case pursuant to 28 U.S.C. §§ 1332 and 1441.

       Presently pending before the Court is Roundo's motion to dismiss the complaint for lack of personal jurisdiction.  For the reasons set forth below, the motion will be granted.

## I.  STANDARD OF REVIEW

      When a defendant moves to dismiss a complaint based on a lack of personal jurisdiction, the plaintiff bears the burden of showing that personal jurisdiction exists. *Marten v. Godwin*, 499 F.3d 290, 295-96 (3d Cir.2007).  "In deciding a motion to dismiss for lack of personal jurisdiction, we take the allegations of the complaint as true.  But once a defendant has raised a jurisdictional defense, a plaintiff bears the burden of

proving by affidavits or other competent evidence that jurisdiction is proper." *Dayhoff Inc. v. H.J. Heinz Co.*, 86 F.3d 1287, 1302 (3d Cir.1996) (internal citations omitted). In demonstrating that jurisdiction is proper, the plaintiff is required to establish facts with reasonable particularity. *Mellon Bank (East) PSFS, Nat'l Ass'n v. Farino*, 960 F.2d 1217, 1223 (3d Cir.1992). In addition, since personal jurisdiction is "inherently a matter which requires resolution of factual issues outside the pleadings," a plaintiff may not rely entirely on general averments in the pleadings. *Time Share Vacation Club v. Atlantic Resorts*, Ltd., 735 F.2d 61, 66 n. 9 (3d Cir.1984). Where a court does not hold an evidentiary hearing on personal jurisdiction, the plaintiff need only state a prima facie case. *Metcalfe v. Renaissance Marine, Inc.*, 566 F.3d 324, 330 (3d Cir.2009).

## II. BACKGROUND

Defendant Roundo is a Swedish corporation with its principle place of business located in Hassleholm, Sweden. Defendant Comeq is a Maryland corporation with its principle place of business located there. Roundo is the designer and manufacturer of the Roll Machine in question, which was sold to GE in 1984 by Comeq.

From at least 1970 through 2008, Comeq acted as Roundo's exclusive agent and distributor in the North American market. Between the years 1970 and 2008, approximately 231 Roundo machines were introduced into the Commonwealth through sales involving Comeq. Some sixty-one (61) machines found their way into the Commonwealth during the years 1970 through 1984, and thirty-seven (37) were sold to Pennsylvania customers during the time span 1983-85.

During this time period,[1] Comeq acted as an independent, albeit exclusive,

---

[1] Both Comeq and Roundo represent in their discovery responses that the agreement which would have been in effect at the time of the 1984 sale cannot be located. However, Roundo has supplied copies of two subsequent Sales Agreements, the first having been effect from November 5, 1993 until February 24, 2009, and the second having been in effect from February 24, 2009 until present. (*See* Def.'s Ex. C, Roundo's Objections and Answers to Jurisdictional Discovery [27-3] at p. 2, ¶ (C); *id*. at

distributer of certain specified Roundo products with a territory covering the United States and Canada.  (Def.'s Ex. C [27-3] at p. 21.)  Comeq purchased Roundo's products from Roundo and then resold them in its own name, for its own account, and at prices established by Comeq.  (*Id.*)

Appended to Roundo's motion to dismiss is various paperwork documenting Comeq's sale of the Roll Machine to GE in 1984.  This documentation includes a January 9, 1984 letter from Comeq to GE providing a price quote for the Roll Machine, a General Electric purchase order directed to Comeq dated February 2, 1984, a Comeq packing list dated July 31, 1984 indicating shipment of the machine to GE, a Comeq invoice dated July 31, 1984 directed to GE, and a bill of lading showing shipment of the machine from Roundo to Comeq.  (Ex. B to Mot. to Dismiss [27-2].)

Roundo acknowledges that it was aware of Comeq's 1984 sale of the Roll Machine to GE but states that it was only aware of this sale because GE had made a special request to Comeq to provide it with a quotation that would reflect the substitution of certain component parts manufactured by GE in place of the standard Roundo component parts.  Although Roundo was aware of the sale of the subject Roll Machine to GE in 1984, Roundo did not initiate this transaction.  Rather, the transaction appears to have been initiated by GE's inquiry to Comeq.  Apart from this sale, Roundo disclaims any knowledge as to which of its products were ultimately sold by Comeq to Pennsylvania customers.

Roundo has never been licensed to do business in the Commonwealth and has never sought any qualification to do business here.  It has never had a designated agent for service of process in Pennsylvania.  It maintains no offices, has no affiliated

---

pp. 13-27; Pl.'s Ex. 1, Comeq's Objections and Answers to Jurisdictional Discovery [29-1] at p. 2, ¶ (C).)  Because the sales agreement dated November 5, 1993 is temporally more proximate to the time period in question, the Court refers to its terms and accepts Roundo's representation that it is substantially similar to the agreement that would have been in effect in 1984.

corporate entity, and has no directors, officers, employees, agents or residents assigned to duty within the Commonwealth. Roundo does not maintain any assets in the Commonwealth of Pennsylvania, such as personal or real property, stock, securities, negotiable or non-negotiable instruments or commercial papers. It has never maintained any telephone listing or bank accounts here. Further, it does not sell products over the internet to customers within the United States or within the Commonwealth of Pennsylvania. Roundo has never advertised in Pennsylvania or solicited business there. It does not have any outstanding loans to or with any banking institution within the Commonwealth nor any other financial ties to this State. It has never paid taxes of any kind in Pennsylvania and has never previously consented to personal jurisdiction in any court of the United States or of Pennsylvania. (*See* Affidavit of Ola Kajrup, Ex. A to Mot. to Dismiss [27-1].)

## III. DISCUSSION

Federal district courts "may assert personal jurisdiction over a nonresident of the state in which the court sits to the extent authorized by the law of that state." *D'Jamoos*, 566 F.3d 94, 102 (3d Cir. 2009) (quoting *Provident Nat'l Bank v. Cal. Fed. Sav. & Loan Ass'n*, 819 F.2d 434, 436 (3d Cir. 1987)). *See also Marten v. Godwin*, 499 F.3d 290, 296 (3d Cir. 2007); *O'Connor v. Sandy Lane Hotel Co., Ltd.*, 496 F.3d 312, 316 (3d Cir. 2007). In theory, this involves a two-step inquiry whereby courts determine first whether the forum state's long-arm statute extends jurisdiction to the nonresident defendant and second whether the exercise of that jurisdiction would comport with federal due process principles. *See Pennzoil Products Co. v. Colelli & Associates, Inc.*, 149 F.3d 197, 202-03 (3d Cir. 1998). In actuality, however, Pennsylvania courts typically restrict their personal jurisdiction inquiry to the question whether the exercise of personal jurisdiction over the nonresident defendant would be constitutional, since Pennsylvania's Long-Arm statute authorizes jurisdiction to the fullest extent permissible under the U.S. Constitution. *See* 42 Pa. C.S.A. § 5322(b); *Renner v. Lanard Toys*

4

*Limited*, 33 F.3d 277, 279 (3d Cir. 1994) ("[T]his court's inquiry is solely whether the exercise of personal jurisdiction over the defendant would be constitutional."); *Pennzoil Products Co.*, *supra*, at 200 (3d Cir. 1998) ("A district court's exercise of personal jurisdiction pursuant to Pennsylvania's long-arm statute is therefore valid as long as it is constitutional.").

In this case, Plaintiff posits, and I agree, that Pennsylvania's Long-Arm statute extends jurisdiction to Roundo under the "tort out/ harm in" provision. *See* 42 Pa. C.S.A. § 5322(a)(4) (stating that Pennsylvania courts may exercise personal jurisdiction over a person "who acts directly or by an agent, as to a cause of action or other matter arising from such person: ... [c]ausing harm or tortious injury in this Commonwealth by an act or omission outside this Commonwealth."). *See Pennzoil Products Co., supra*, at 201-02. Accordingly, our analysis will focus on whether this Court's assertion of jurisdiction over Roundo in this matter is consistent with federal due process principles.

In making this determination, we consider whether Roundo, the nonresident defendant, has "certain minimum contacts" with this Commonwealth such that "the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *See D'Jamoos*, 566 F.3d at 102 (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). We recognize two types of in personam jurisdiction, *to wit*, general and specific.

General jurisdiction results from, among other things, the non-resident defendant's "systematic and continuous" contact with the forum state. *See Int'l Shoe Co. v. Washington*, 326 U.S. 310, 320 (1945). Where general jurisdiction exists, the forum state may exercise personal jurisdiction over the non-resident defendant even for non-forum-related activities.

Specific jurisdiction, on the other hand, allows for the exercise of personal jurisdiction over a non-resident defendant for actions arising out of or relating to the defendant's contact with the forum. *See Mellon Bank (East) PSFA, Nat'l Assn. v. Farino*, 960 F.2d 1217, 1221 (3d Cir.1992). Here, there is no claim of general

jurisdiction and the parties agree that, if personal jurisdiction exists, it is specific.

In determining whether specific personal jurisdiction exists over Roundo, we undertake a three-part inquiry, described by our circuit court of appeals as follows:

> First, the defendant must have "purposefully directed [its] activities" at the forum. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472, 105 S. Ct. 2174, 2182, 85 L. Ed.2d 528 (1985) (internal quotation marks omitted). Second, the litigation must "arise out of or relate to" at least one of those activities. [*Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 (1984)]; *O'Connor*, 496 F.3d at 317. And third, if the first two requirements have been met, a court may consider whether the exercise of jurisdiction otherwise "comport[s] with 'fair play and substantial justice.'" *Burger King*, 471 U.S. at 476, 105 S. Ct. at 2184 (*quoting Int'l Shoe*, 326 U.S. at 320, 66 S. Ct. at 160).

*D'Jamoos*, 566 F.3d at 102.

The first two inquiries are concerned with determining whether the defendant has the requisite minimum contacts with the forum. *Id*. "The threshold requirement is that the defendant must have "purposefully avail[ed] itself of the privilege of conducting activities within the forum State." *Id*. (quoting *Hanson v. Denckla*, 357 U.S. 235, 253 (1958)). *See O'Connor*, 496 F.3d at 317. It is not necessary, for purposes of this requirement, to show that the defendant physically entered the forum state. *D'Jamoos*, 566 F.3d at 103; *O'Connor*, 496 F.3d at 317. Nevertheless, the defendant's contacts must amount to "a deliberate targeting of the forum." *D'Jamoos*, 566 F.3d at 103 (quoting *O'Connor*, 496 F.3d at 317). Unilateral activity on the part of a plaintiff claiming "some relationship with a nonresident defendant" is insufficient. *Id*. (quoting *Hanson*, 357 F.3d at 253); *O'Connor*, 496 F.3d at 317 (same).

Assuming the defendant can be shown to have purposefully directed its activities at the forum state, then it must next be shown that the litigation "arises out of or relate[s] to" at least one of those contacts. *O'Connor*, 496 F.3d at 318. Although the Supreme Court has not yet expounded on the scope of this second requirement, the Third Circuit has recently clarified that it encompasses, as a necessary starting point, the concept of "but-for causation," *see O'Connor,* 496 F.3d at 322-23, meaning that "the

6

plaintiff's claim would not have arisen in the absence of the defendant's contacts." *Id*.

at 319. The Third Circuit has made clear that "but-for causation" is a "useful starting

point for the relatedness inquiry," but it is not the end of the inquiry, *id*. at 322, for

"specific jurisdiction requires a closer and more direct causal connection than that

provided by the but-for test." *Id*. at 323. Although "there is no 'specific rule' susceptible

to mechanical application in every case," *id*., and the inquiry is "necessarily fact-

sensitive," *id*., our Court of Appeals has explained that

> the analysis should hew closely to the reciprocity principle upon which
> specific jurisdiction rests. *See Burger King*, 471 U.S. at 475-76, 105 S.
> Ct. 2174. With each purposeful contact by an out-of-state resident, the
> forum state's laws will extend certain benefits and impose certain
> obligations. *See Int'l Shoe*, 326 U.S. at 319, 66 S.Ct. 154. Specific
> jurisdiction is the cost of enjoying the benefits. *See Schwarzenegger v.
> Fred Martin Motor Co.*, 374 F.3d 797, 802 (9th Cir.2004) ("In return for
> the[ ] benefits and protections [of a state's laws,] a defendant must-as a
> quid pro quo-submit to the burdens of litigation in that forum.") (quotations
> marks omitted); *Coté v. Wadel*, 796 F.2d 981, 984 (7th Cir.1986)
> ("Personal jurisdiction over nonresidents of a state is a quid for a quo that
> consists of the state's extending protection or other services to the
> nonresident."). The relatedness requirement's function is to maintain
> balance in this reciprocal exchange. In order to do so, it must keep the
> jurisdictional exposure that results from a contact closely tailored to that
> contact's accompanying substantive obligations. The causal connection
> can be somewhat looser than the tort concept of proximate causation, *see
> Miller Yacht*, 384 F.3d at 99-100, but it must nonetheless be intimate
> enough to keep the quid pro quo proportional and personal jurisdiction
> reasonably foreseeable.

*Id*. (alterations in the original).

Assuming that sufficient minimum contacts can be established between the

nonresident defendant and the forum state, courts will consider whether the exercise of

jurisdiction would otherwise comport with "traditional notions of fair play and substantial

justice." *O'Connor*, 496 F.3d at 324 (quoting *Int'l Shoe*, 326 U.S. at 316). Because the

existence of minimum contacts makes jurisdiction presumptively constitutional, the

defendant at step three of the specific-jurisdiction-inquiry process "must present a

compelling case that the presence of some other considerations would render

jurisdiction unreasonable." *Id*. (quoting *Burger King*, 471 U.S. at 477). The burden

upon the defendant at this stage of the inquiry is considerable. *See Pennzoil Prods.*

*Co.,* 149 F.3d at 207 (noting that if minimum contacts are present, then jurisdiction will be unreasonable only in "rare cases"); *Grand Entertainment Group, Ltd. v. Star Media Sales, Inc.*, 988 F.2d 476, 483 (3d Cir.1993) ("The burden on a defendant who wishes to show an absence of fairness or lack of substantial justice is heavy."). For purposes of conducting this third step of analysis, we bear in mind that

> [t]he Supreme Court has identified several factors that courts should consider when balancing jurisdictional reasonableness. Among them are "the burden on the defendant, the forum State's interest in adjudicating the dispute, the plaintiff's interest in obtaining convenient and effective relief, the interstate [and international] judicial system's interest in obtaining the most efficient resolution of controversies," *Burger King*, 471 U.S. at 477, 105 S. Ct. 2174 (quotation marks omitted), and "[t]he procedural and substantive interests of other nations." *Asahi Metal Indus. Co. v. Superior Court*, 480 U.S. 102, 113, 115, 107 S. Ct. 1026, 94 L. Ed.2d 92 (1987).

*O'Connor*, 496 F.3d at 324.

Here, Plaintiff appears to be arguing in favor of specific personal jurisdiction based on two different theories. His first theory is that, in actuality, the Roll Machine was sold to GE not by Comeq but by Roundo itself, using Comeq merely as a conduit. This theory, however, is belied by the documentation pertaining to the sale, which suggests that Comeq provided a price quotation for the Roll Machine to GE in response to an inquiry made by GE to Comeq. (See Def.'s Ex. B [27-2] at pp. 1-3.) Comeq's responses to discovery indicate that GE was a customer of Comeq, not Roundo. (See Pl.'s Ex. 1 [29-1] at p. 9 ¶ 16.) Consistent with this representation, Roundo's exhibits document that GE generated a purchase order for the Roll Machine directed to Comeq and Comeq generated a corresponding invoice for the machine directed to GE. (See Def.'s Ex. B at pp. 4-5, 7-8.) The packing list and bill of lading evidence shipment of the machine from Roundo to Comeq and subsequent shipment from Comeq to GE. (*Id*. at 6, 9-10.) Finally, the 1993 sales agreement between Comeq and Roundo establishes that Comeq was an independent, albeit exclusive, distributer of certain specified Roundo products within the North American continent. (Def.'s Ex. C [27-3] at p. 21.) Pursuant to this agreement, Comeq purchased Roundo's products from Roundo and

then resold them in its own name, for its own account at prices established by Comeq. (*Id*.)  Based on these facts, I find that Comeq, not Roundo, sold the subject Roll Machine to GE in 1984.

"The separate existence of corporate entities **is** generally respected for jurisdictional purposes, and the activities of one entity are imputed to another only if [the] [p]laintiff establishes that they should be regarded as alter egos," *Bootay v. KBR, Inc.*, No. 2:09-cv-1241, 2010 WL 3632720 at *3 (W.D. Pa. Sept. 9, 2010), a situation which arises most commonly in the context of parent and subsidiary corporations. Courts within this circuit have considered a variety of factors when determining whether a subsidiary corporation is an alter ego of the parent, including, *e.g.*, whether there exists:

> (1) ownership of all or most of the stock of the subsidiary; (2) common officers and directors; (3) a common marketing image; (4) common use of a trademark or logo; (5) common use of employees; (6) an integrated sales system; (7) interchange of managerial and supervisory personnel; (8) subsidiary performing business functions which the principal corporation would normally conduct through its own agents or departments; (9) subsidiary acting as marketing arm of the principal corporation, or as an exclusive distributor; and [(] 10) receipt by officers of the related corporation of instruction from the principal corporation.

*Atlantic Pier Associates, LLC v. Boardakan Restaurant Partners L.P.*, Civil Action No. 08-4564, 2010 WL 3069607 at *3 (E.D. Pa. Aug. 2, 2010) (citations omitted).  Plaintiff has made no showing here of factors that would justify a finding of personal jurisdiction over Roundo by virtue of an "alter ego" type theory.

Plaintiff's second (and main) argument for establishing specific personal jurisdiction pertains to the "stream of commerce" theory.  As our circuit court of appeals has explained, "[c]ourts have relied on the stream-of-commerce theory to find a basis for personal jurisdiction over a non-resident defendant, often a manufacturer or distributor, which has injected its goods into the forum state indirectly via the so-called 'stream of commerce.'"  *D'Jamoos*, 566 F.3d at 104-05.

In *Asahi Metal Industry Co. v. Superior Court*, 480 U.S. 102 (1987), the Supreme Court addressed the elements of jurisdiction under the stream-of-commerce theory. The Court was unanimous in holding that due process principles precluded the district court from exercising personal jurisdiction over Asahi based on the particular facts of that case; however, no majority of the Justices could agree on the precise standards for establishing "purposeful availment" in the context of the stream-of-commerce theory. The Third Circuit Court of Appeals has summarized the resulting split of opinions on this point as follows:

> In Part II-A of the opinion, writing for a plurality of four, Justice O'Connor found that the mere placement of a product into the stream of commerce with an awareness that it may end up in a particular state was not enough to establish minimum contacts. "[A]dditional conduct ... [that] may indicate an intent or purpose to serve the market in the forum State" is needed before personal jurisdiction can be exercised over the defendant, *id.* at 112, 107 S. Ct. at 1032, because "minimum contacts must have a basis in 'some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws,'" *id.* at 111, 107 S. Ct. at 1031 (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475, 105 S. Ct. 2174, 2183, 85 L. Ed. 2d 528 (1985)).

> Justice O'Connor provided the following examples of the type of "additional conduct" needed to establish purposeful availment and, therefore, minimum contacts: "designing the product for the market in the forum State, advertising in the forum State, establishing channels for providing regular advice to customers in the forum State, or marketing the product through a distributor who has agreed to serve as the sales agent in the forum State." *Asahi*, 480 U.S. at 112, 107 S. Ct. at 1032. Justice O'Connor concluded:

>> [A] defendant's awareness that the stream of commerce may or will sweep the product into the forum State does not convert the mere act of placing the product into the stream into an act purposefully directed toward the forum State.

> *Id.*

> Justice Brennan, writing for four Justices in a concurring opinion, disagreed with this interpretation of the "stream of commerce" theory. He believed that if there is a "regular and anticipated flow of products from manufacture to distribution to retail sale" and the defendant is aware that the final product is being marketed in the forum state, no additional conduct on the defendant's part need be shown to establish minimum contacts. *Id.* at 117, 107 S.Ct. at 1034.

> Justice Stevens, the ninth vote, wrote a short concurring opinion (joined by Justices White and Blackmun who had also joined Justice Brennan's opinion). He rejected the plurality's assumption that "an unwavering line can be drawn between 'mere awareness' that a component will find its way into the forum State and 'purposeful availment' of the forum's market." *Id.* at 122, 107 S. Ct. at 1037. He stated that whether or not Asahi's conduct, which was arguably more than the placement of a product into the stream of commerce, rises to the level of purposeful availment "requires a constitutional determination that is affected by the volume, the value, and the hazardous character of the components." *Id.* He concluded that

> in most cases a regular course of delivering over 100,000 units annually would constitute "purposeful availment." *Id.*

*Renner*, 33 F.3d at 281-82.

The Third Circuit Court of Appeals has not yet determined which, if any, of these alternative standards should govern the analysis of stream-of-commerce cases in this jurisdiction. *See D'Jamoos*, 566 F.3d at 105 n. 15. Although Plaintiff posits that Justice Brennan's analysis "most closely resembles that of the Third Circuit" (Pl.'s Supp. Br. [32] at p. 2), it is clear that our court of appeals has not yet expressed any preference for one approach over another. *See Renner*, 33 F.3d at 282 (noting that "the 4-4-1 vote of the Supreme Court [in *Asahi*] makes it difficult to even attempt to promulgate the last word on the 'stream of commerce' theory"). *See also Pennzoil Products Co. v. Colelli & Associates, Inc.*, 149 F.3d at 207 n. 11 ("[S]ince we have not manifested a preference for either of the two [*Asahi*] standards [as described by Justices O'Connor and Brennan], the demands of clarity counsel us to apply both standards explicitly.") In fact, in *Renner*, the Court of Appeals expressly indicated that Justice O'Connor's analysis remains relevant to the minimum contacts inquiry. In reversing the district court's dismissal of a toy plane manufacturer on jurisdictional grounds, the court held that the plaintiff should have been given a chance to engage in jurisdictional fact discovery. Among the issues which the court suggested might be deserving of further development were certain considerations outlined by Justice O'Connor in *Asahi*, *to wit*: whether the manufacturer could be shown to have marketed or designed its toys for the Pennsylvania market; whether the manufacturer's sales of its toys to a particular buying agent might constitute "marketing the product through a distributor who has agreed to serve as the sales agent in the forum State"; whether advertisements for the manufacturer's toys had been conducted within Pennsylvania; how many of the manufacturer's products were being sold in Pennsylvania; and whether the manufacturer participated in any toy shows aimed at selling toys to a multi-state market that includes Pennsylvania. 33 F.3d at 283-84.

11

In *Pennzoil Products Company v. Colelli & Assoc., Inc.*, the court of appeals again addressed the stream-of-commerce theory and decided the case by expressly analyzing the nonresident defendants' contacts under both the O'Connor and Brennan standards. Under both analytical models, the court found that the defendants, two Ohio corporations (collectively referred to as "Colelli"), had the necessary minimum contacts with Pennsylvania such that they could be sued in this forum by a Pennsylvania refinery for damages allegedly attributable to a solvent sold by Colelli which had found its way into the plaintiff's oil. In arriving at this determination, the court found several facts important, *to wit*: (1) Colelli had marketed and sold the solvent in question to Ohio producers of Penn grade and Corning grade crude oil and approximately sixty percent (60%) of that crude oil had been sold to Pennsylvania refineries; (2) Colelli's founder knew that oil produced by Colelli's Ohio customers was going to the plaintiff's refinery (which was the biggest in Pennsylvania); and (3) Colelli's owner had, on a previous occasion, sent samples of solvents to laboratory personnel at the plaintiff's refinery for testing, and had held a number of telephone conversations with those personnel to discuss testing procedures and methodology, in connection with a separate contamination problem that Colelli had attempted to remedy. *See Pennzoil Products Co.*, 149 F.3d at 206-07. The court concluded that, "regardless of whether one applies the O'Connor standard or the Brennan standard, Colelli purposely availed itself of the laws of Pennsylvania by deriving financial benefits from its customers' sale of crude oil to Pennsylvania refineries." *Id.* at 207.

In short, because Justice Brennan's plurality opinion in *Asahi* is not binding precedent and because the Third Circuit has not expressly endorsed any one of the various *Asahi* opinions to the exclusion of the others, we assume that each of them remains relevant. Regardless which standard is used, however, I find that the evidence of record fails to establish the minimum contacts necessary in order for this Court to constitutionally exercise personal jurisdiction over Roundo.

With respect to the standard annunciated by Justice O'Connor, there is no

12

evidence here of the sort of "additional conduct" that would indicate "purposeful availment" by the nonresident defendant. There is no evidence, for example, that Roundo generally designed its products with a Pennsylvania market in mind. On the contrary, Roundo's products were, as a rule, designed for a world market, and Roundo denies ever changing any aspect of its product designs so as to comply with any law, regulation, ordinance or standard applicable within the Commonwealth of Pennsylvania. (See Ex. C to Def.'s Mot. to Dismiss [27-3] at pp. 9-10 ¶¶ 13-15.) *Cf. Renner*, 33 F.3d at 283-84 (reversing dismissal on Rule 12(b)(2) grounds where the plaintiff had been denied an opportunity to engage in jurisdictional discovery that might have shed light on, among other things, whether the manufacturer had been involved in having its product tested to meet protocols applicable to a Pennsylvania market). Although in this particular case the subject Roll Machine was designed according to specifications provided by GE so as to accommodate the incorporation of certain GE component parts, there is no evidence to suggest that this was Roundo's normal practice. Moreover, the available evidence suggests that this was done upon GE's unilateral request to Comeq, which was then parlayed by Comeq to Roundo, not as the result of any pre-existing marketing strategy designed to attract Pennsylvania customers.

Also lacking is any evidence concerning the advertisement of Roundo products within the Commonwealth. Roundo's sworn answers to jurisdictional discovery indicate that it never advertised its products within the Commonwealth (*see* Ex. C to Def.'s Renewed Mot. to Disimiss [27-3] at p. 6 ¶ 6), and there is no evidence of record to suggest otherwise.[2] Nor does the record reveal what efforts, if any, were made by

---

[2] We note Plaintiff's inclusion in the record of an exhibit purportedly showing that a Pennsylvania business known as Action Machinery Co., Inc. advertised various product lines, including Roundo products, on its website as of July 24, 2009. (Pl.'s Ex. 7 [29-7] at pp. 1-2.) Because this singular exhibit significantly post-dates both the year in which the Roll Machine was sold (1984) and the year in which Plaintiff was injured (2005), and because the nature of this entity's relationship to Roundo is not clear from the record, we find that the exhibit does not meaningfully inform the Court's analysis of Roundo's Pennsylvania contacts.

Comeq, Roundo's exclusive North American distributor, to advertise or otherwise market Roundo's products specifically within the Commonwealth.

Plaintiff nevertheless contends that Roundo, through Comeq, has engaged in another indicator of "purposeful availment" under Justice O'Connor's line of analysis, *i.e.*, "establishing channels for providing regular advice to customers in the forum State." *Renner*, 33 F.3d at 281. The November 5, 1993 Sales Agreement between Roundo and Comeq does indicate that Comeq would both act as Roundo's exclusive sales agent within the specified "Territory" and that it would "take care of all servicing on the Products." (Ex. C to Def.'s Renewed Mot. to Dismiss [27-3] at pp. 21-22.) However, the relevant "Territory" covered by the agreement is the entire North American continent, including both Canada and the United States. Thus, at most, it may be said that Roundo established channels for providing regular advice to customers within in the North American continent generally, but not necessarily Pennsylvania in particular.

Such a showing is insufficient, because a "defendant's contacts ... must amount to 'a deliberate targeting of the forum.'" *D'Jamoos*, 566 F.3d at 103 (citation omitted). In a similar vein, the plaintiffs in *D'Jamoos* argued (unsuccessfully) that, because the defendant, an aircraft manufacturer, had targeted the United States market as a whole, it had a purposeful affiliation with every state in the country and should therefore have expected to be sued in any state where one of its aircraft might crash. The court of appeals rejected this view, explaining that

> the critical finding that the defendant purposefully availed itself of the privilege of conducting activities within the forum requires contacts that amount to a deliberate reaching into the forum state to target its citizens. *See Burger King*, 471 U.S. at 475-76, 105 S. Ct. at 2184; *O'Connor*, 496 F.3d at 317-18. Pilatus's efforts to exploit a national market necessarily included Pennsylvania as a target, but those efforts simply do not constitute the type of deliberate contacts within Pennsylvania that could amount to purposeful availment of the privilege of conducting activities in that state. Rather, any connection of Pilatus to Pennsylvania merely was a derivative benefit of its successful attempt to exploit the United States as a national market.

14

*D'Jamoos*, 566 F.3d at 103-04.

Alternatively, Justice Brennan's theory would find the necessary minimum contacts whenever there is a "regular and anticipated flow of products from manufacture to distribution to retail sale" and the defendant is aware that the final product is being marketed in the forum state. Plaintiff contends that this test is satisfied because of the fact that some 231 Roundo machines were sold by Comeq to Pennsylvania customers between the years 1970 and 2008. Between 1970 and 1984, the year the machine in question was sold, Comeq sold sixty-one (61) Roundo machines to Commonwealth customers. We have not been provided any specific breakdown to show how many Roundo machines typically entered the Commonwealth in any given year, but simple division based on the foregoing figures suggests an average somewhere in the vicinity of 4 to 6 machines per year. We are also without any information as to what percentage of Roundo's total annual sales and revenues were generated by these forum-related contacts. Plaintiff has submitted evidence from Roundo's website representing that Roundo has sold over 15,000 machines since its inception in 1964 and that it is capable of shipping more than 300 machines per year, 97% of which are sold worldwide. Taking those figures at face value, we might reasonably assume that Roundo's forum-related sales constituted perhaps 1- 2 % of its total machines sold during the years in question. This figure is somewhat higher if we consider Plaintiff's proffer that 37 Roundo machines were introduced into the Commonwealth during the years 1983-1985. Assuming total sales in the vicinity of at least 300 machines per year, we might reasonably estimate that as much as 6 % of all Roundo machines sold during the time frame 1983-1985 ultimately made their way into the Commonwealth. With respect to more recent years, the record shows that Roundo sold six Section Bending Machines to Comeq between 2003 and 2009, but there is no evidence in the record indicating which, if any, of these machines were ultimately resold to customers in Pennsylvania. (*See* Def.'s Ex. C [27-3] at ¶ (A).)

Assuming *arguendo* that these types of figures could constitute a "regular and

anticipated" flow of Roundo's products into the Commonwealth – a point which is by no means clear under the current state of the law, that is still not the end of the inquiry; Justice Brennan's analysis also requires the nonresident defendant's awareness that its products are being marketed in the forum state. *See Asahi*, 480 U.S. at 117 ("The stream of commerce refers not to unpredictable currents or eddies, but to the regular and anticipated flow of products from manufacturer to distribution to retail sale. *As long as a participant in this process is aware that the final product is being marketed in the forum State, the possibility of a lawsuit there cannot come as a surprise.*") (emphasis added). Here, the record is devoid of any evidence shedding meaningful light on Comeq's marketing efforts, if any, within the Commonwealth, much less is there any evidence demonstrating Roundo's awareness of those efforts. Roundo's sworn answers to jurisdictional discovery indicate that it possesses no documentation relative to Comeq's sales of Roundo products within the Commonwealth, no customer warranty lists for owners/operators of Roundo products within the Commonwealth, and no documentation relative to Comeq's marketing efforts within the Commonwealth. (*See* Ex. C to Def.'s Renewed Mot. to Dismiss [27-3] at pp. 1-5.) Roundo itself has never advertised its products within the Commonwealth and it denies having participated in any trade shows aimed at selling products to a multi-state market that included Pennsylvania during the years 1982-1986. (*Id*. at pp. 5-6.) While its own representatives travel to the United States on average once per year to provide technical support, they have never traveled to Pennsylvania. (Id. at pp. 11-12, ¶¶ 18-19.)

Plaintiff nevertheless suggests that we should infer the requisite awareness on the part of Roundo based solely on the number of units which were sold within the Commonwealth over the course of 38 years and the fact that Comeq's principle place of business, Maryland, borders the Commonwealth. I find this evidence insufficient to establish Roundo's awareness that its products were being marketed within the Commonwealth or specifically with Pennsylvania customers in mind. As we have seen,

16

the number of Roundo machines sold to Pennsylvania buyers over the years seems to have comprised, at best, only a very small percentage of the more than 15,000 machines Roundo claims to have distributed around the world, and Roundo has generally disavowed any knowledge concerning Comeq's sales to Pennsylvania customers apart from the sale of the Roll Machine at issue in this case. (*See* Ex. C to Def.'s Renewed Mot. to Dismiss [27-3] at p. 8, ¶¶ 8-10.) Moreover, neither Comeq's status as Roundo's exclusive distributor nor its geographic proximity to this forum tells us anything meaningful about the efforts Comeq made toward selling Roundo's products to Pennsylvania customers. Comeq's target market during the years in question, as we have noted, was not Pennsylvania *per se*, or even a regional area including Pennsylvania, but rather the entire North American continent, and web information submitted by the Plaintiff suggests that Comeq has sold over 4,000 Roundo products throughout the North American market since 1970. (*See* Pl.'s Ex. 3 [29-3] at p. 1.) Thus, Comeq's sales to Pennsylvania customers seems to have comprised only a small percentage of its total North American sales.

Moreover, the most recent version of the sales agreement governing Roundo's relationship with Comeq suggests that the latter functioned with considerable independence so as to conduct its sales activities within this large geographic region largely as it saw fit.[3] To be sure, the fact that a nonresident manufacturer employs an

---

[3] According to the agreement, Comeq's obligations were, "[a]t its own expense, to make every effort in the due course of business to sell the Products throughout the whole of the Territory and for this purpose to maintain an efficient and qualified sales organization and provide a service organization to take care of all servicing on the Products." (Ex. C to Def.'s Renewed Mot. to Dismiss [27-3] at p. 22, ¶ 3(a).) Comeq also promised not to disclose proprietary information, not to directly or indirectly sell any competing products, and to sell its products under the Roundo trademark. (*Id*. at p. 22, ¶ 3(b)-(d).) Roundo, for its part, agreed (i) to "use its best endeavours to assist Comeq in its sales activities and for this purpose to furnish it free of charge with all sales literature ad other printed matter," (ii) to give Comeq the right of first refusal relative to sales rights of any new machinery; (iii) to provide a limited manufacturer's warranty relative to its products; and (iv) to train Comeq staff free of charge at its headquarters,

independent distributor to distribute its goods in the stream of commerce does not automatically insulate the manufacturer from being found amenable to suit in the forum state. *See DeJames v. Magnificence Carriers,* Inc., 654 F.2d 280, 285 (3d Cir. 1981) (discussing the "stream of commerce" doctrine as a theory whereby "a manufacturer may be held amenable to process in a forum in which its products are sold, even if the products were sold indirectly through importers or distributors with independent sales and marketing schemes."). But the fact that Comeq apparently acted independently in distributing Roundo's products throughout the United States and Canada tends to belie any inference that Roundo necessarily knew whether and how its products were being marketed in this particular forum, especially given the relatively low volume of Comeq's forum-related sales. Accordingly, we cannot infer, based solely on the number of Roundo units sold within the Commonwealth and/or Pennsylvania's proximity to Maryland, the kind of forum-specific contacts on the part of Comeq that are required in order to impute "purposeful availment" to Roundo.

All of this is not to suggest that the number of Roundo's products sold within the Commonwealth is irrelevant. In fact, Justice Stevens' approach in *Asahi* would consider not only the volume, but also the value and the hazardous character of the products that are being shipped into the forum state. In *Renner*, the Court of Appeals suggested that this line of analysis might be expected to produce jurisdictional results that are generally consistent with the results obtained using Justice O'Connor's method of analysis. Justice O'Connor's view, the *Renner* Court wrote, "might meld with that of Justice Stevens (and perhaps with that of Justice Brennan) because it is likely that if a significant amount of the defendant's products are sold to customers in any given state, the plaintiff will be able to show an intentional marketing toward that state." 33 F.3d at 283.

---

with Comeq to pay travel and lodging." (*Id*. at ¶ 4.) It was Comeq's obligation to fulfill the terms of any warranty on behalf of Roundo. (*Id*. at p. 23, ¶ 5(b).)

Of course, it is not entirely clear what constitutes a "significant amount" of the defendant's product for purposes of establishing the necessary jurisdictional contacts. In *Asahi*, Justice Stevens was "inclined to conclude" that Asahi's regular course of dealing "that result[ed] in deliveries of over 100,000 units annually over a period of several years would constitute 'purposeful availment' even though the item delivered to the forum State was a standard product marketed throughout the world." 480 U.S. at 122. In *Pennzoil Products Company v. Colelli & Assoc., Inc.*, the court of appeals relied heavily on the fact that approximately 60% of the crude oil produced by Colelli's customers was sold to Pennsylvania refineries. Although it was not the central focus of the court's discussion, the *Pennzoil* Court noted that Colelli's contacts with Pennsylvania would satisfy Justice Steven's test, as the "relative volume and value ... of the silicon-laced oil forwarded to Pennsylvania [was] not in dispute." 149 F.3d at 207 n. 12.

Whatever the volume of product distribution necessary to establish "a significant amount" for jurisdictional purposes, however, I conclude that it has not been shown to exist in this case. As we have seen, it is unclear what percentage of Roundo's total sales and revenues – or Comeq's for that matter –  were comprised of Pennsylvania-related distribution. At best, the court can extrapolate from available information that the number of Roundo machines which found their way into the Commonwealth during the years in question comprised a small percentage of Comeq's total unit sales and an even smaller percentage of Roundo's total sales. No evidence has been provided concerning the percentage of revenues derived from Roundo's forum-related sales.

In sum, then, regardless which *Asahi* standard is applied in this case, the evidence of record fails to show a purposeful availment by Roundo of the laws of Pennsylvania such that we can constitutionally assert personal jurisdiction over it in the matter at hand. This conclusion makes it unnecessary for me to consider whether the assertion of personal jurisdiction over Roundo "would comport with 'fair play and substantial justice.'" *See D'Jamoos*, 566 F.3d at 106 ("Because we conclude that

19

appellants fail to establish that Pilatus had the required minimum contacts within Pennsylvania, we do not consider, under the third prong of a specific jurisdiction analysis, whether the exercise of specific jurisdiction over Pilatus 'would comport with fair play and substantial justice.'") (internal quotation marks omitted) (citations omitted).

## IV.  CONCLUSION

Based upon the foregoing reasons, I conclude that the Pennsylvania Long-Arm Statute extends to Roundo's conduct as alleged in the complaint.  Nevertheless, I also find that Roundo lacks the minimum contacts with this forum that are necessary to permit this Court to assert personal jurisdiction over Roundo consistent with the demands of due process.  Accordingly, Defendant Rondo's motion to dismiss the complaint pursuant to Fed. R. Civ. P. 12(b)(2) will be granted.

An appropriate order follows.

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

ALBERT WILLIAM RENNER,      )
                                    )
            Plaintiff,       )
                                    )     Case. No. 1:08-cv-209-SJM
           v.               )
                                    )
ROUNDO AB, a foreign corporation,  )
*et al.,*                               )
                                  )
            Defendant.    )

# O R D E R

AND NOW, *to wit*, this 29th day of September, 2010, for the reasons set forth in the accompanying Memorandum Opinion,

IT IS ORDERED that the Renewed Motion to Dismiss [27], filed on behalf of Defendant Roundo AB be, and hereby is, GRANTED, and the claims against said Defendant shall be, and hereby are, DISMISSED for lack of personal jurisdiction.

                                      s/     <u>Sean J. McLaughlin</u>

                                           SEAN J. McLAUGHLIN
                                           United States District Judge

cc:    All counsel of record.